129 P.3d 71

G. Robert MUTSCHLER, Jr., a single man; Willian ("Billie") Markus, a single woman; Guys & Dolls, LLC, an Arizona limited liability company, Plaintiffs–Appellants,

v.

CITY OF PHOENIX, a municipality, Defendant–Appellee.

No. 1 CA–CV 04–0203.

Court of Appeals of Arizona, Division 1, Department E.

Feb. 14, 2006.

Review Denied June 27, 2006.

Berens, Kozub, Lord & Kloberdanz, PLC by Daniel L. Kloberdanz, Scottsdale, Attorneys for Appellant.

Peter Van Haren, Phoenix City Attorney by James H. Hays, Phoenix, Attorneys for Appellee.

## OPINION

HALL, Presiding Judge.

¶ 1 Appellants Robert G. Mutschler, Jr. and Willian Markus appeal from the order entered by the superior court in favor of the City of Phoenix (City) granting the City's motion to dismiss appellants' regulatory taking claim. Concluding that no Fifth Amendment "taking" of property occurred when the City raided appellants' live sex act business and effectively closed it, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶ 2 In 1998 the Phoenix City Council adopted an Ordinance that made the operation of a live sex act business illegal in the City. See Phoenix Ariz., Ordinance No. G–4145 (Dec. 9, 1998) (the Ordinance). The Ordinance amended the Phoenix City Code (P.C.C.) by adding the following language:

The operation of a business for purposes of providing the opportunity to engage in, or the opportunity to view, live sex acts is declared to be a disorderly house and a public nuisance per se which should be prohibited[.]

P.C.C. § 23–54(A)(1) (1998).

¶ 3 Appellants own a business known as "Guys & Dolls," a social or "swingers" club that is located in the City. Appellants and members and owners of other clubs brought a pre-enforcement challenge to the constitutionality of the Ordinance in federal district court on various grounds, including a claim

that the Ordinance constituted an unconstitutional regulatory taking in violation of the Fifth Amendment to the United States Constitution.[1] The court denied the challengers' request for a preliminary injunction preventing enforcement of the Ordinance, finding that they had not met their burden of establishing that § 23–54 failed to substantially advance a legitimate public purpose. *Recreational Devs. of Phoenix, Inc. v. City of Phoenix (Recreational Devs. I)*, 83 F.Supp.2d 1072, 1101 (D.Ariz.1999). Subsequently, the court determined that the challengers "failed to refute [the City's] plainly legitimate justification for the Ordinance— curbing the spread of sexually transmitted diseases" and granted summary judgment to the City. *Recreational Devs. of Phoenix, Inc. v. City of Phoenix (Recreational Devs. II)*, 220 F.Supp.2d 1054, 1069 (D.Ariz.2002).

¶ 4 On September 21, 2002, the Phoenix Police Department executed a "raid" called "Operation Social Night Out" on several swingers clubs, including Guys & Dolls, and arrested appellant Markus. Appellants contend that as a result of the raid and arrest of Markus,[2] Guys & Dolls experienced a "huge economic downturn" because of the continued threat of arrest for operating the club. Appellants closed Guys & Dolls on September 22, 2002. It remained closed until the property was leased in March 2003. Appellants

claim, however, that the revenue derived from leasing the property is significantly less than the revenue generated by the club before the raid.

¶ 5 Appellants thereafter filed a complaint alleging that the City's actions denied appellants the economically viable use of their property and that the selective enforcement of the Ordinance constituted a permanent taking entitling appellants to just compensation under the United States and Arizona Constitutions. The City moved to dismiss the complaint arguing: 1) appellants failed to properly and timely serve the City with a notice of the inverse condemnation claim; 2) some or all of the claims were barred by res judicata, collateral estoppel, or the rule against splitting a cause of action; 3) all claims were barred by the statute of limitations; 4) the court lacked jurisdiction; and 5) the complaint failed to state a claim upon which relief may be granted. After oral argument the court ordered the parties to file supplemental briefs regarding appellants' inverse condemnation claims.

¶ 6 In their supplemental briefing, appellants argued that the enactment of the Ordinance constituted an "as-applied" taking pursuant to the three-pronged test derived from *Penn Central Transportation Company v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).[3]

1. The "Takings Clause" of the Fifth Amendment to the Constitution of the United States provides "nor shall private property be taken for public use, without just compensation." The Takings Clause is " 'designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 123–24, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (quoting *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)). The clause is made applicable to the states by the Due Process Clause of the Fourteenth Amendment. *Id.* at 122, 98 S.Ct. 2646; *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1007, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).
   Appellants also rely on Article 2, Section 17 of the Arizona Constitution, which provides that "[n]o private property shall be taken or damaged for public or private use without just compensation having first been made...." Under both the Federal and Arizona Constitutions, a regulatory "taking" of private property occurs when a zoning ordinance deprives a property owner eco-

nomically viable use of the land. *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), *limited on other grounds by, Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005); *Ranch 57 v. City of Yuma*, 152 Ariz. 218, 226–27, 731 P.2d 113, 121–22 (App.1986). For purposes of this case, the analysis of appellants' Takings Clause claim is the same under both the Federal and Arizona Constitutions.

2. In a separate proceeding, Mutschler was convicted in Phoenix City Court for violating the Ordinance. On appeal, we rejected his argument that the Ordinance was vague and/or overbroad in violation of the First Amendment and determined that the Ordinance was constitutionally valid on its face. *State v. Mutschler*, 204 Ariz. 520, 525, ¶¶ 16, 21, 65 P.3d 469, 474 (App. 2003).

3. A facial challenge to a statute regulating the uses that can be made of property requires the landowner to show that the mere enactment of the statute denies the owner of all economically

¶ 7 Treating the City's motion as one for summary judgment because both parties presented materials beyond the pleadings, *see Blanchard v. Show Low Planning & Zoning Comm'n*, 196 Ariz. 114, 117, ¶ 11, 993 P.2d 1078, 1081 (App.1999); Ariz. R. Civ. P. 12(b), the trial court granted the City summary judgment on two separate grounds. First, it found that the content of the notice of claim was insufficient to put the City on reasonable notice of the inverse condemnation claim. Second, applying the *Penn Central* three-prong test for an "as-applied" taking, it held that appellants had not met their prima facie burden of establishing that the government action resulted in a loss to appellants of "all reasonable use or value of the entirety of the property." We have jurisdiction pursuant to Arizona Revised Statutes (A.R.S.) section 12–2101(B) (2003).

## DISCUSSION

¶ 8 We review the trial court's grant of summary judgment de novo and view the evidence and reasonable inferences in a light most favorable to the non-moving party. *Aranki v. RKP Inv., Inc.*, 194 Ariz. 206, 208, ¶ 6, 979 P.2d 534, 536 (App.1999). We will affirm the trial court's ruling if the court was correct for any reason. *Glaze v. Marcus*, 151 Ariz. 538, 540, 729 P.2d 342, 344 (App.1986).

¶ 9 Appellants claim that the judgment below cannot be upheld on either of the bases relied upon by the trial court. The City, while asserting that the trial court properly dismissed the complaint for the reasons cited in its ruling,[4] renews the argument it made in the trial court that the Ordinance is a regulatory action taken to prevent harmful or noxious use of property akin to a public nuisance, and that permitting live sex acts is not a use the loss of which entitles appellants to be compensated under the Fifth Amendment "Takings Clause." Therefore, according to the City, the trial court's *Penn Central* analysis was unnecessary because, even if the regulation substantially affected the property's value, no taking occurred.

¶ 10 The City's argument is based on a line of United States Supreme Court cases dating back to *Mugler v. Kansas*, 123 U.S. 623, 668–69, 8 S.Ct. 273, 31 L.Ed. 205 (1887), in which the Court held that a law prohibiting the use or sale of alcohol was not a taking:

A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or appropriation of property.... The power which the states have of prohib-

---

viable use of his or her land. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 494–95, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). An "as applied" challenge, as here, occurs when the landowner attacks the application of the regulation to specific property. *Id.* at 495, 107 S.Ct. 1232.

As explained in *Penn Central*, a government regulation that places limitations on land use but does not eliminate all economically beneficial use of the property may nonetheless constitute a taking of property without just compensation. *Id.* at 124–25, 98 S.Ct. 2646. Subsequent cases applying *Penn Central* have held that the basic analytical tool for assessing whether a regulatory taking has occurred requires the court to engage in an ad hoc, factual inquiry balancing three factors: 1) the regulation's economic effect on the landowner, 2) the extent to which the regulation interferes with reasonable investment-backed expectations, and 3) the character of the government action. *See, e.g., Tahoe–Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 315 n. 10, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002); *Palazzolo v. Rhode Island*, 533 U.S. 606, 617, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001).

4. Appellants sent the City a series of three letters setting forth various theories of liability and damage claims, one of which concludes by stating "[t]his letter in no way limits our right ... to file a lawsuit seeking injunctive relief or inverse condemnation damages." The City argues, and the trial court apparently agreed, that notice of a claim pursuant to A.R.S. § 12–821.01 requires identification of each specific *legal* theory upon which liability is claimed, and that the reference to the additional possibility of an inverse condemnation claim was insufficient. Appellants contend, however, that the claims statute "does not require a claimant to spell out every detail of every legal theory of a claim." Section 12–821.01(A) provides in pertinent part: "The claim shall contain facts sufficient to permit the public entity ... to understand the basis upon which liability is claimed."

No Arizona case has specifically determined whether the word "claim" in § 12–821.01(A) refers to a particular legal theory "upon which liability is claimed" or simply references the claimant's broader claim for relief. We need not answer this issue because we affirm the trial court on other grounds.

iting such use by individuals of their property, as will be prejudicial to the health, the morals, or the safety of the public, is not, and, consistently with the existence and safety of organized society cannot be, burdened with the condition that the state must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community.

Over the next 100 years, the Supreme Court consistently held that regulations prohibiting the noxious use of land that effectively closed existing businesses or other actions by governments against nuisance-type activity resulting in the destruction of private property were a legitimate exercise of police powers that did not give rise to Fifth Amendment takings claims. *See, e.g., Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (ordinance prohibiting the manufacture of bricks in residential areas of the city); *Miller v. Schoene,* 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928) (state action ordering certain property owners to destroy diseased cedar trees to prevent the infection of apple orchards); and *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962) (ordinance prohibiting excavation to extract gravel below the water table). *See also Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 491 n. 20, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) ("[S]ince no individual has a right to use his property so as to create a nuisance or otherwise harm others, the State has not 'taken' anything when it asserts its power to enjoin the nuisance-like activity.").

¶ 11 Based on this line of authority, the City claims that its regulatory prohibition of live sex act clubs as public nuisances is not a constitutional taking of property for which appellants are entitled to receive "just compensation." Appellants, however, claim that the noxious-use justification has been substantially limited by *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

¶ 12 In *Lucas,* the claimant paid just under one million dollars for beach-front property in South Carolina on which he intended to build single-family homes, a legal use under the then-existing land use regulations. 505 U.S. at 1006–08, 112 S.Ct. 2886. Two years later, however, the South Carolina legislature enacted the Beachfront Management Act, which had the effect of barring the owner from building any permanent habitable structures on his property and rendering his property "valueless." *Id.* at 1007, 112 S.Ct. 2886. He filed suit arguing that the Act effected a taking of his property without just compensation. *Id.* at 1009, 112 S.Ct. 2886. Citing *Mugler v. Kansas,* amongst other cases, the South Carolina Supreme Court ruled that Lucas was not entitled to any compensation because the Act was a regulation respecting the use of property designed to prevent serious public harm. *Lucas,* 505 U.S. at 1010, 112 S.Ct. 2886 (citing *Lucas v. S.C. Coastal Council,* 304 S.C. 376, 404 S.E.2d 895, 899 (1991)). Reversing the state supreme court, the United States Supreme Court held that the recitation by a legislature of a mere "harmful or noxious use" justification was insufficient to depart from "our categorical rule that total regulatory takings must be compensated." *Id.* at 1026, 112 S.Ct. 2886. Otherwise, "departure would virtually always be allowed." *Id.* Instead, when a regulation deprives the land of any economically beneficial use, the State "may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." *Id.* at 1027, 112 S.Ct. 2886.[5] Such confiscatory regulations

> must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership. A law or decree with such an effect must ... do no more than duplicate the result that could have been achieved in the courts—by adjacent landowners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nuisances

---

5. The Court distinguished the *Mugler* line of cases on the basis that "[n]one of them [ ] employed the logic of 'harmful use' prevention to

sustain a regulation ... that ... wholly eliminated the value of the claimant's land." *Id.*

that affect the public generally, or otherwise.

*Id.* at 1029, 112 S.Ct. 2886.[6]

¶ 13 Both parties interpret *Lucas* as providing support for their positions. Appellants cite *Lucas* for the proposition that a noxious-use justification does not eliminate the City's obligation to pay just compensation for a regulatory taking. The City claims that *Lucas* supports its position that it owes no compensation regardless of the Ordinance's effect on the property's value because a live sex act is a public nuisance that may be restricted without implicating the Takings Clause.

¶ 14 Appellants are correct that the government may not immunize itself from Fifth Amendment takings liability by the expedient of labeling a particular use-limiting regulation as one designed to prevent a noxious use. Rather, under *Lucas,* compensation is automatically required (for a total taking) if the regulation "proscribe[s] a productive use that was previously permissible under relevant property and nuisance principles." *Id.* at 1029–30, 112 S.Ct. 2886. But *Lucas* also reaffirmed that a regulation does not result in a compensable taking if the state can demonstrate that the regulation only bans conduct that constitutes a public nuisance pursuant to "background principles of nuisance and property law." *Id.* at 1031, 112 S.Ct. 2886. *See generally* Michael C. Blumm & Lucus Ritchie, *Lucas's Unlikely Legacy: The Rise of Background Principles as Categorical Takings Defenses,* 29 Harv. Envtl. L.Rev. 321 (2005).

¶ 15 Appellants contend, however, that the nuisance defense is inapplicable here because they are asserting only a "partial" taking, which they assert requires analysis

pursuant to *Penn Central's* multi-factor ad hoc balancing test. It appears that the trial court may have agreed with appellants on this point because it applied the *Penn Central* test without first determining whether appellants' use of the property for a swingers club is a protected property interest that was part of the "bundle of rights" acquired by them when they purchased the property. However, the logic of the rationale for the *Lucas* nuisance exception—that there can be no taking of a non-existent private property right—appears equally applicable to all takings claims, including partial regulatory takings that would otherwise be analyzed pursuant to the *Penn Central* test. Other jurisdictions have so held. *See, e.g., Appolo Fuels, Inc. v. United States,* 381 F.3d 1338, 1347 (Fed.Cir.2004) ("It is a settled principle of federal takings law that under the *Penn Central* analytic framework, the government may defend against liability by claiming that the regulated activity constituted a state law nuisance without regard to the other *Penn Central* factors."); *Raceway Park, Inc. v. Ohio,* 356 F.3d 677, 683 (6th Cir.2004) (noting, before engaging in *Penn Central* analysis, "[w]e could appropriately end our Takings Clause analysis here, as there is no taking if there is no private property in the first place."); *Machipongo Land & Coal Co. v. Pennsylvania,* 569 Pa. 3, 799 A.2d 751, 774 (2002) ("[I]f the Commonwealth is able to show that the Property Owner's proposed use of the stream would unreasonably interfere with the public right to unpolluted water, the use, as a nuisance, may be prohibited without compensation."); *Kim v. City of New York,* 90 N.Y.2d 1, 659 N.Y.S.2d 145, 681 N.E.2d 312, 314 (1997) ("A threshold inquiry into an owner's title is generally necessary to the proper analysis of a takings case, whether of a regulatory or

---

**6.** The Court then provided two examples when a property owner would not be entitled to compensation:

On this analysis, the owner of a lake-bed, for example, would not be entitled to compensation when he is denied the requisite permit to engage in a landfilling operation that would have the effect of flooding others' land. Nor the corporate owner of a nuclear generating plant, when it is directed to remove all improvements from its land upon discovery that the plant sits astride an earthquake fault. Such regulatory action may well have the ef-

fect of eliminating the land's only economically productive use, but it does not proscribe a productive use that was previously permissible under relevant property and nuisance principles. The use of these properties for what are now expressly prohibited purposes was *always* unlawful, and (subject to other constitutional limitations) it was open to the State at any point to make the implication of those background principles of nuisance and property law explicit.

*Id.* at 1029–1030, 112 S.Ct. 2886.

physical nature. . . ."); *City of Des Moines v. Gray Businesses, LLC.*, 130 Wash.App. 600, 124 P.3d 324, 331 (2005) (rejecting partial regulatory taking claim because the "specific right [to lease property for a mobile home use] is not a fundamental attribute of ownership."). As noted by Bluum and Ritchie, the nuisance exception is a complete bar to a Fifth Amendment Takings claim:

> [T]he background principles defense to takings liability is expansive. Courts in multiple jurisdictions have determined that *Lucas's* threshold inquiry applies not only to *Lucas*-style complete economic wipeout takings, but also to physical occupation cases and, more importantly, to *Penn Central*-type regulatory cases where less than total economic deprivation has occurred. Consequently, the first question a court must address in any takings case (whether a *Lucas, Penn Central*, or physical occupation scenario) is whether the property use at issue was in fact one of the sticks in the bundle of rights acquired by the owner. If the contested use was not authorized by the claimant's title at purchase, a court should reject the takings claim at the threshold level.

29 Harv. Envtl. L.Rev. at 325–36.

¶ 16 We can perceive no valid reason why the nuisance exception as narrowed by *Lucas* should apply to the rare situation in which the government regulatory action renders the property valueless but not to the run-of-the-mill *Penn Central* case in which the property retains some economically beneficial use. Rather, in either instance, the particular interest in land with respect to which a takings claimant asserts a diminution in (or elimination of) value must be a protected property interest, that is, one that inhered in the title acquired by the claimant when he purchased the property, before any determination is made whether the governmental action amounted to a compensable taking of that property interest. *See Air Pegasus of D.C., Inc. v. U.S.*, 424 F.3d 1206, 1212–13 (Fed.Cir.2005) (explaining two-step process for evaluating takings claims: "[W]e do not reach this second step [i.e., whether the ac-

tion amounted to a compensable taking] without first identifying a cognizable property interest."). Accordingly, we agree with the City that the trial court should have ruled on the City's "nuisance exception" defense as a threshold matter before reaching the *Penn Central* analysis.

¶ 17 We now consider the applicability of the nuisance exception to the undisputed facts of this case. The relevant question is whether appellants could have been restrained from operating their business in a common-law action for public nuisance. *Lucas*, 505 U.S. at 1031, 112 S.Ct. 2886. If so, the appellants' live sex act business is not a protected property interest under the Fifth Amendment.

¶ 18 The Ordinance states that the operation of live sex businesses contributes to the spread of sexually transmitted diseases and is "inimical to the health, safety, general welfare and morals of the inhabitants of the city of Phoenix" and classifies the operation of a live sex acts business as a "public nuisance per se." P.C.C. § 23–54(A)(1)–(3).[7] These findings were based on reports entitled "Sex Clubs, Factual Record" and "Sexually Oriented Businesses, Factual Record, Supplement." § 24–54(A)(4). The Factual Record includes a police memorandum detailing observations by undercover detectives who had visited various social clubs and had witnessed numerous incidents of sexual activity, some involving more than one couple, in which none of the male participants wore condoms. The memorandum also expressed concerns with cleanliness, noting that the "potential exist [sic] for unwanted contact with different bodily fluids which include saliva, semen, blood, and fecal matter." Memorandum from Anthony B. Vasquez, Sergeant, City of Phoenix Organized Crime Bureau, to Larry T. Jacobs, Lieutenant, City of Phoenix Organized Crime Bureau (Nov. 13, 1998) (Sexually Oriented Businesses, Factual Record, Supplement).

■ ¶ 19 We acknowledge that the mere recitation in a statute that a particular activity constitutes a public nuisance does not automatically render the government im-

---

7. A nuisance per se or at law is "[a]n act, occupation, or structure which is a nuisance at all times and under any circumstances, regardless of location or surroundings." Black's Law Dictionary 962 (5th ed.1979).

mune from Fifth Amendment Takings liability. *See Lucas,* 505 U.S. at 1025, 112 S.Ct. 2886 (rejecting the view that the legislature can avoid compensation by reciting a harm-preventing justification for its action: "Since such a justification can be formulated in practically every case, this amounts to a test of whether the legislature has a stupid staff."). Conversely, there is nothing that prevents a legislature from enacting a law that makes explicit its right to prohibit activity that was already contrary to existing law. *Id.* at 1030, 112 S.Ct. 2886. Moreover, municipalities have unquestioned authority to define and regulate public nuisances. *See, e.g., Hislop v. Rodgers,* 54 Ariz. 101, 113, 92 P.2d 527, 533 (1939) (stating that "even in the absence of statutes, it is within the power of municipal corporations to determine and declare what shall constitute a nuisance").

■ ¶ 20 Although incapable of precise definition, a public nuisance is broadly defined as "an unreasonable interference with a right common to the general public." Restatement (Second) of Torts § 821B(1) (1979). An unreasonable interference with a public right includes circumstances in which "the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience[.]" Restatement § 821B(2)(a). At common law, public nuisances included "interference with the public health, as in the case of keeping diseased animals or the maintenance of a pond breeding malarial mosquitoes" and "with the public morals, as in the case of houses of prostitution or indecent exhibitions[.]" Restatement § 821B cmt. b. *See also* A.R.S. § 13–2917(A)(1) (2001) (defining public nuisance to include anything "injurious to health, indecent, offensive to the senses or an obstruction to the free use of property that interferes with the comfortable enjoyment of life or property by an entire community or neighborhood or by a considerable number of persons"); *Engle v. State,* 53 Ariz. 458, 465, 90 P.2d 988, 991 (1939) (definition of public nuisance in a substantively identical prior version of § 13–2917 was intended to cover offenses that were construed at common law as public nuisances).

¶ 21 We readily conclude that the conduct proscribed by the Ordinance could have been prohibited as a common-law public nuisance. Relying on the extensive information presented to it and the public hearings it held, the City concluded that live sex act clubs would contribute to the spread of sexually transmitted diseases and were contrary to public morals. That the potential spread of STDs was a matter of substantial public concern is highlighted by the fact that, according to an affidavit submitted by appellant Markus in the federal district court proceedings, Guys and Dolls had 7,000 members. *See Recreational Devs. II,* 220 F.Supp.2d at 1057. Two similar clubs, Club Chameleon and Encounters, had 27,000 and 9,000 members, respectively. *Id.* Members paid a nominal annual fee; most of the clubs' income was derived from per visit fees ranging from $20 to $30. *Recreational Devs. I,* 83 F.Supp.2d at 1078.

¶ 22 Under these circumstances, even without addressing the question of public morality, appellants' business clearly fell within the type of conduct that could have been abated at common law as a public health hazard. Therefore, because the Ordinance does not "proscribe a productive use that was previously permissible under relevant ... nuisance laws," *Lucas,* 505 U.S. at 1030, 112 S.Ct. 2886, live sex act businesses fall within the *Lucas* "nuisance exception" to the Takings Clause.

¶ 23 Finally, appellants argue that the Ordinance (as applied to them) nonetheless constitutes a regulatory taking because the City, having knowledge that they intended to operate Guys & Dolls as a swingers club, issued them the appropriate permits. We need not address the merits of this estoppel-like argument because its premise—that the licenses issued by the City permitted the operation of a live sex act club—is mistaken. As pointed out by the City, the privilege sales tax license, the environmental services permit, and the sign permit issued to appellants did not confer some special benefit or privilege, but rather are general permits commonly required to operate a private business. Indeed, although the City does license sexually oriented businesses, appellants would not have qualified because that license applies only to adult arcades, adult cabarets, adult motels, and adult theaters. P.C.C. § 10–133.

¶ 24 In summary, appellants' operation of a swingers' club that included live sex acts constituted the type of public nuisance as a matter of law for which compensation is not required under *Lucas*.[8] Because public nuisances are not protectable property interests under the Fifth Amendment, the City's enforcement of the Ordinance did not implicate the Takings Clause and appellants are not entitled to compensation.[9]

## CONCLUSION

¶ 25 For the above stated reasons, the trial court's grant of summary judgment in favor of the City is affirmed.

DONN KESSLER and ANN A. SCOTT TIMMER, JJ., concur.

---

8. Such activity constitutes a public nuisance per se, *see supra* n. 7. Therefore, no further development of the factual record is necessary and the City is entitled to judgment as a matter of law.

9. Because the Takings Clause does not apply to the facts of this case, we need not decide whether the trial court correctly found that appellants failed to establish a prima facie case for inverse condemnation under the *Penn Central* prong requiring consideration of the regulation's economic effect. We note, however, that a *Penn Central* analysis includes as one factor that a court must examine the extent to which the regulation interferes with a claimant's *reasonable* investment-backed expectation. We doubt that a government regulation prohibiting a common-law nuisance could ever be considered as interfering with such an expectation.