IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | |
|---|---|
| DOS PICOS LAND LIMITED PARTNERSHIP, an Arizona limited partnership; HARRY W. SHEPARD and PATRICIA P. SHEPARD, husband and wife,

Plaintiffs/Appellees,

v.

PIMA COUNTY, a political subdivision of the State of Arizona,

Defendant/Appellant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

2 CA-CV 2009-0186
DEPARTMENT A

O P I N I O N

APPEAL FROM THE SUPERIOR COURT OF PINAL COUNTY

Cause No. CV200500478

Honorable Stephen F. McCarville, Judge

VACATED AND REMANDED

Ayers & Brown, P.C.
  By Charles K. Ayers and Melinda A. Bird                                          Phoenix
                                                                Attorneys for Plaintiffs/Appellees

Barbara LaWall, Pima County Attorney
  By Thomas Weaver, Jr., Lesley M. Lukach, and                                      Tucson
  Andrew L. Flagg                                               Attorneys for Defendant/Appellant

E S P I N O S A, Judge.

¶1        Pima County challenges the trial court's award of litigation expenses and its calculation of interest on a judgment compensating landowners in an inverse condemnation action. Concluding the trial court relied on inapplicable statutes in awarding attorney fees, other litigation expenses, and interest, we vacate its ruling and remand this case to the trial court for a recalculation of the award.[1]

## Factual and Procedural History

¶2        The following facts are undisputed. Dos Picos Land Limited Partnership and Harry and Patricia Shepard (collectively Dos Picos) owned 165 acres of property west of Tucson. Dos Picos's land was surrounded on the south, east, and west by Tucson Mountain Park, a mountain preserve owned by Pima County. At some point during the 1980s, a mountain ridge dividing the northern portion of Dos Picos's land from the southern portion was declared a "protected ridge," which meant a special use permit from Pima County was then required in order to develop it. During the 1990s, Pima County "identified and approved" Dos Picos's property for potential inclusion in the park and entered into negotiations to purchase it. Dos Picos was unwilling to sell, however, intending instead to subdivide the property and sell individual lots as homesites.

¶3        Although the northern portion of Dos Picos's property was accessible from Anklam Road, the southern portion was surrounded by county land with no road access.

---

[1]We previously issued an opinion in this case, filed August 31, 2010. Pursuant to Pima County's request for clarification of the relief granted, we have vacated that opinion and issue this one in its place.

Consequently, in 1999 Dos Picos sought a special use permit to build a road across the protected ridge in order to connect the northern and southern portions of its land, but Pima County denied its request. Later, in 2004, Dos Picos petitioned the county to build a roadway across county land for access to the southern half of its property. After Pima County denied this request, Dos Picos sued for inverse condemnation, arguing the county's actions constituted a governmental taking of private property.

¶4 Thereafter, Dos Picos filed a motion for partial summary judgment. The trial court granted the motion, finding as a matter of law that Pima County had effected a taking of Dos Picos's land. Following a jury trial to establish the property's value, the court entered a judgment ordering Pima County to pay Dos Picos the principal sum of $1,466,455, plus interest at the rate of ten percent from the date of the taking. It also awarded Dos Picos $366,439 in attorney fees as well as $115,282 in other litigation expenses pursuant to A.R.S. § 11-972(B). Pima County timely appealed the award of fees, expenses, and interest. We have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1) and 12-2101(B).

## Discussion

**Applicability of A.R.S. § 11-972(B)**

¶5 Pima County first argues the trial court erred in awarding Dos Picos its attorney fees and litigation expenses, contending § 11-972(B) does not apply because this was a regulatory and not a physical taking. A court may award attorney fees only when they are "'expressly authorized by contract or statute,'" and the party seeking fees must

3

prove that the statute is applicable and authorizes compensation in his or her case. *McMurray v. Dream Catcher USA, Inc.*, 220 Ariz. 71, ¶ 7, 202 P.3d 536, 539-40 (App. 2009), *quoting Burke v. Ariz. State Ret. Sys.*, 206 Ariz. 269, ¶ 7, 77 P.3d 444, 447 (App. 2003). On appeal, we review a trial court's interpretation of a statute de novo, *Estate of DeSela v. Prescott Unified Sch. Dist. No. 1*, 224 Ariz. 202, ¶ 7, 228 P.3d 938, 940 (App. 2010), mindful that statutory language is the most reliable evidence of the legislature's intent and construing words "'in conjunction with the full text of the statute,'" *McMurray*, 220 Ariz. 71, ¶ 8, 202 P.3d at 540, *quoting Golder v. Dep't of Rev.*, 123 Ariz. 260, 265, 599 P.2d 216, 221 (1979).

¶6        Section 11-972(B) provides that, when a trial court in an inverse condemnation action initiated "because of [an] alleged physical taking" awards compensation to the landowner "for the physical taking of property," the landowner is entitled to reimbursement for reasonable costs and litigation expenses. The plain and unambiguous language of the statute establishes, therefore, that § 11-972(B) applies only to physical takings. *See Arpaio v. Citizen Publ'g Co.*, 221 Ariz. 130, ¶ 6, 211 P.3d 8, 10 (App. 2008) (statutory language controls if plain and unambiguous); *see also Backus v. State*, 220 Ariz. 101, ¶ 22, 203 P.3d 499, 504 (2009) (refusing to read into statute term not included by legislature). To hold otherwise effectively would eliminate the qualifying term "physical" from the statute, something we may not do. *See Simpson v. Simpson*, 224 Ariz. 224, ¶ 6, 229 P.3d 236, 237 (App. 2010) (court will not interpret statute in manner rendering any word, phrase, or clause meaningless); *see also State v.*

4

*Pitts*, 178 Ariz. 405, 407, 874 P.2d 962, 964 (1994) ("We presume the legislature did not intend to write a statute that contains a void, meaningless, or futile provision."). Accordingly, Dos Picos was entitled to its litigation expenses under the statute only if it showed Pima County had physically taken its property.

¶7 Physical and regulatory takings are two distinct events. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 548 (2005); *State ex rel. Herman v. Jacobs*, 7 Ariz. App. 396, 400, 440 P.2d 32, 36 (1968); *see also State ex rel. Herman v. Hague*, 10 Ariz. App. 404, 406, 459 P.2d 321, 323 (1969) (impairing direct access to property constitutes compensable taking; actual physical taking of property not required). Physical takings are characterized by "direct government appropriation or physical invasion of private property." *Lingle*, 544 U.S. at 537; *see, e.g.*, *United States v. Pewee Coal Co.*, 341 U.S. 114 (1951) (seizure of coal mine); *United States v. Gen. Motors Corp.*, 323 U.S. 373 (1945) (occupation of private warehouse). Regulatory takings, in contrast, do not result from physical invasions of property but from government regulations that deprive an owner of the economic benefit of the property. *Lingle*, 544 U.S. at 537-38. A "permanent physical invasion, however minimal the economic cost it entails, eviscerates the owner's right to exclude others from entering and using her property" and warrants compensation. *Id.* at 539. In contrast, whether a regulatory action constitutes a compensable taking depends "upon the magnitude of [the] regulation's economic impact and the degree to which it interferes with legitimate property interests." *Id.* at 540.

**¶8** To prove a compensable taking, therefore, Dos Picos was required to show either that Pima County had physically invaded its land or that county regulations substantially interfered with Dos Picos's economic interest in the land. Dos Picos presented no evidence the county had ever physically entered or invaded its property and, contrary to its assertions on appeal, the trial court did not expressly find a physical taking or that the county "had taken [its p]roperty in order to incorporate it into" Tucson Mountain Park.[2] Rather, the court's ruling that Dos Picos was entitled to its expenses under § 11-972 rested on its finding that a taking, generally, had occurred.[3] In so finding, the court apparently disregarded Pima County's argument that the court was required to find a physical taking before applying the statute.[4]

**¶9** Dos Picos maintains that, by denying it a special use permit to build a road over the protected ridge and similarly denying its request that the county build a road to

---

[2]In its ruling, the trial court acknowledged that Tucson Mountain Park "encompass[ed]" Dos Picos's property and that the county in the past had targeted the land for acquisition to become part of the park. Similarly it noted that the county had indicated "no access to the southern portion of the property was acceptable." Acknowledgment of these facts, however, is far removed from stating that the county physically took the land and incorporated it into the park.

[3]For the same reason, it is immaterial that Dos Picos argued to the trial court that the county's actions constituted a physical taking.

[4]Even had the trial court expressly found a physical and not a regulatory taking had occurred, this would be a conclusion of law subject to our de novo review. *See Mutschler v. City of Phoenix*, 212 Ariz. 160, ¶¶ 8-9, 129 P.3d 71, 73 (App. 2006) (reviewing de novo trial court's summary judgment on issue of taking); *see also Gammoh v. City of La Habra*, 395 F.3d 1114, 1122 (9th Cir. 2005) (summary judgment ruling that no regulatory taking occurred subject to de novo review); *City of Sherman v. Wayne*, 266 S.W.3d 34, 46 (Tex. App. 2008) (whether taking occurred ultimately question of law).

access the southern portion of its land, Pima County physically appropriated the land. Specifically, Dos Picos argues that, by denying all access to the property, Pima County effectively incorporated the land into the Tucson Mountain Park and thus accomplished the same result as a physical taking. Dos Picos further asserts that, because the county wanted the land only for open space within its mountain preserve, it was able to effect a physical taking for that purpose without needing to actually enter the property. Pima County, on the other hand, notes that it had no more physical access to or ownership of the property after it denied Dos Picos's administrative requests than it did before the denials. And it points out that Dos Picos's land was not made a part of Tucson Mountain Park and concludes nothing prevents Dos Picos from erecting fences, prohibiting trespassers, or exhibiting other indicia of private ownership.[5]

¶10        Despite the superficial appeal of Dos Picos's argument that this is an anomalous situation in which Pima County was able to effect a physical taking through regulatory means, such a characterization would undermine the definition of "regulatory taking" altogether. The hallmark of a regulatory taking is the imposition of governmental regulations that impermissibly limit an owner's free use of his or her property. *See Lingle*, 544 U.S. at 538-39. "'[W]hile property may be regulated to a certain extent, if

---

[5]In a notice of supplemental authority filed after oral argument, Dos Picos asserts its property is in a "No-Fence District" and asks this court to take judicial notice of this fact. Even were we to do so, however, the code regulation it cites expressly permits fencing, merely placing restrictions on the type and height of fence an owner may build. *See* Pima County Code § 18.67.050(D). Accordingly, any argument based on the existence of an alleged "No-Fence District" lacks merit.

regulation goes too far it will be recognized as a taking.'" *Ranch 57 v. City of Yuma*, 152 Ariz. 218, 225, 731 P.2d 113, 120 (App. 1986), *quoting Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).

¶11     Dos Picos cites *Kaiser Aetna v. United States*, 444 U.S. 165 (1979), and *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), for the proposition that a physical taking occurs when the government interferes with an owner's right to exclude others from his or her property. Although we are not called on here to comment on this general proposition, that is not what happened here. *Kaiser Aetna* involved a privately owned pond that, when altered by its owners and converted to a marina, was classified a navigable waterway of the United States, to which the government asserted a right of public access. 444 U.S. at 165-66, 179. In finding such access amounted to a physical taking in violation of the Fifth Amendment, the Supreme Court held that "the imposition of navigational servitude . . . result[ed] in an actual physical invasion of the privately owned" waterway. *Id*. at 180. Thus, the actual physical taking turned on the government's insistence that the owners sacrifice their right to exclude others. Similarly, *Nollan* also involved a governmental entity's demanding public access to private property. In that case, the California Coastal Commission conditioned the granting of a permit to rebuild an uninhabitable house on the creation of a public easement across the coastline abutting the home. 483 U.S. at 827-28, 831. The Supreme Court held the government had physically and permanently occupied private land when "individuals

8

[we]re given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed." *Id*. at 832.

**¶12** The precedential value of *Kaiser Aetna* and *Nollan* is completely undercut here by the absence of any county mandate that Dos Picos open its property to public access or use. Dos Picos maintains that Pima County's regulations adversely affected its ability to exclude the public, who, as a result of the regulation, "had access to and use of Dos Picos['s] Property for hiking, picnicking and the like." But this contention is not supported by the record nor is the use of Dos Picos's property by members of the public a logical or necessary consequence of the county's actions. Nothing in the record suggests that the absence of a road allowed or encouraged public access to Dos Picos's land.[6] Nor has Pima County required Dos Picos to hold the land open for public use or restricted its demarking the land as private and prohibiting trespass. The county's regulations did nothing but maintain the status quo on undeveloped, private land, and it is difficult for us to see how its refusal to make the land more accessible to both its owners and members of the public alike appropriated the property for public use.

**¶13** Dos Picos also relies on an apparent belief that, if a regulatory taking is sufficiently egregious or is accomplished to promote an ulterior motive, a court may view it as tantamount to a physical taking. Citing *Lucas v. South Carolina Coastal Council*,

---

[6]On the contrary, it would appear that the absence of a road leading to the southern portion of Dos Picos's land would serve as a deterrent rather than an inducement for members of the public to enter and trespass on the property.

9

505 U.S. 1003 (1992), Dos Picos argues that, when regulations amount to a "per se" taking, this effectively becomes a physical taking. But that case does not support Dos Picos's contention. Although in *Lucas* the Supreme Court acknowledged that "total deprivation of beneficial use [of land] is, from the landowner's point of view, the equivalent of a physical appropriation," it did not adopt this as a holding of the Court. 505 U.S. at 1017. In fact, the Court specifically described regulations that "den[y] all economically beneficial or productive use of land" as "regulatory takings," albeit ones that, like physical takings, "categorical[ly]" warranted compensation. *Id.* at 1015-16, 1026; *see also Lingle*, 544 U.S. at 538 (citing *Lucas* as involving regulatory rather than physical taking).

¶14 A regulatory taking is not a less intrusive subset of "takings" generally, but rather a distinct method by which a governmental entity deprives an owner of his or her property rights. Not every regulation amounts to a taking, but only one that "'goes too far.'" *Ranch 57*, 152 Ariz. at 225, 731 P.2d at 120, *quoting Pa. Coal Co.*, 260 U.S. at 415. Once regulation has impermissibly interfered with the owner's economic or other interests in the property, the taking is complete; there are not different degrees of "taking." *Lingle*, 544 U.S. at 539-40 (finding of regulatory takings dependent on extent to which government actions interfere with private rights). Here, the trial court implicitly found the regulations became a taking when they went "'too far'" by effectively limiting Dos Picos's use of its property to be consistent with the surrounding county land used as a mountain preserve and park. Although a court may determine that governmental

regulations have "denie[d] all economically beneficial or productive use of land," justifying compensation without further analysis of the benefits to the public versus the cost to the landowner, this still does not convert a regulatory taking into a physical one. *Lucas*, 505 U.S. at 1015; *see also Lingle*, 544 U.S. at 548 (distinguishing a physical taking from "a *Lucas*-type 'total regulatory taking'").

¶15         Additionally, as previously noted, the trial court made no factual findings that Pima County either physically took the land to incorporate it into the park or intended to do so.[7]  And, because fact-finding is not the province of an appellate court, we will not attempt to infer the county's motives from a barren record.[8]  *See Ahwatukee Custom Estates Mgmt. Ass'n, Inc. v. Bach*, 193 Ariz. 401, ¶ 14, 973 P.2d 106, 109 (1999) (fact-finding within purview of trial court).

---

[7]Dos Picos takes issue with the county's reliance on the absence of factual findings regarding the county's motivations, arguing "there was no need to present th[is] issue."  Although the distinction between a regulatory and a physical taking may have been irrelevant for purposes of valuation, it was relevant under § 11-972.  Accordingly, the burden was on Dos Picos, as the party seeking attorney fees and expenses, to prove this statute applied, which, in turn, meant proving the taking was a physical one.  *See McMurray*, 220 Ariz. 71, ¶ 7, 202 P.3d at 539-40.

[8]Pima County's purported desire to incorporate the land into Tucson Mountain Park is not the only motive the record would support.  Pima County's decisions restricted the building of a road across an environmentally protected ridgeline and declined to use or reprioritize county resources to build a road across county-owned, environmentally protected land.  Environmental protection, cost-containment, and the prudent management of human and fiscal resources would appear to be other potential motives for the county's actions.

**¶16** Accordingly, because Pima County effected a regulatory and not a physical taking of Dos Picos's land, § 11-972(B) does not apply. In light of this conclusion, we need not address Pima County's additional argument that, in accordance with our decision in *Salaz v. City of Tucson*, 157 Ariz. 251, 756 P.2d 348 (App. 1988), *disapproved of by Calmat of Ariz. v. State ex rel. Miller*, 176 Ariz. 190, 859 P.2d 1323 (1993), the trial court was without authority to award attorney fees and expenses because Dos Picos's property was not taken in furtherance of a federally funded project, or Dos Picos's related argument concerning the ongoing validity of *Salaz*. Additionally, because we conclude Dos Picos is not entitled to its litigation expenses at all, we need not reach Pima County's argument that the court wrongly awarded Dos Picos its expenses connected to earlier proceedings regarding the special use permit.

**Interest**

**¶17** We next consider Pima County's argument that the trial court improperly calculated interest on the judgment. The county asserts the court failed to apply the correct combination of interest rate and accrual date under either of the two statutes potentially applicable to this case, thus awarding "[a] higher rate of interest for [a] longer period" than authorized under either statute alone. Pursuant to A.R.S. § 44-1201(A), interest on a civil judgment is payable at the rate of ten percent per annum, while under A.R.S. § 11-269.04(1), the interest rate on a judgment in a direct condemnation action is "[t]he prime rate charged by banks on short-term business loans." Additionally, interest on a condemnation judgment begins to accrue on the date of the taking, *see Tucson*

12

*Airport Auth. v. Freilich*, 136 Ariz. 280, 282, 665 P.2d 1002, 1004 (1983), while interest on a civil judgment begins to accrue when the amount of damages is liquidated, *see Lake Havasu Cmty. Hosp., Inc. v. Ariz. Title Ins. & Trust Co.*, 141 Ariz. 363, 377-78, 687 P.2d 371, 385-86 (App. 1984), *overruled on other grounds by Barmat v. John & Jane Doe Partners A-D*, 155 Ariz. 519, 747 P.2d 1218 (1987). Here, the county contends the trial court applied the interest rate for a civil judgment but the accrual date applicable to a condemnation award. We review de novo the applicability of statutes. *Schoneberger v. Oelze*, 208 Ariz. 591, ¶ 12, 96 P.3d 1078, 1081 (App. 2004).

Rate of Interest

**¶18** Pima County argues § 11-269.04 should apply because the legislature's intent was to apply the same interest rate to direct and inverse condemnation judgments. It maintains the statutory interest rate was not established to provide a financial advantage or disadvantage to the government when it takes private property but rather to provide "a reasonable rate of interest that approximates" what a landowner could have earned by investing money. Accordingly, it contends the trial court erred when it applied the statutory ten percent rate applicable to civil judgments.

**¶19** This case presents a perplexing problem in that Dos Picos clearly is entitled to interest on the judgment as part of just compensation for the taking of its land, *see* Ariz. Const. art. II, § 17; *Calmat*, 176 Ariz. at 192, 859 P.2d at 1325, but the legislature has failed to clearly so provide. Section 11-269.04 applies only to "[i]nterest on a judgment in a condemnation proceeding instituted by the county." Thus, the statute by

13

its terms applies to judgments in direct condemnation actions, on which interest accrues from the date of the taking. In this inverse condemnation action, instituted by Dos Picos and not by Pima County, it appears, therefore, that § 11-269.04 does not control.

¶20    If § 11-269.04 is inapplicable, however, the trial court could only award interest on the judgment pursuant to § 44-1201, the statute governing interest on civil judgments generally. But this statute also does not clearly suit this situation, because interest imposed under § 44-1201 accrues as of the date the amount of damages becomes liquidated. *See Lake Havasu Cmty. Hosp.*, 141 Ariz. at 377-78, 687 P.2d at 385-86. And "[a] claim is liquidated 'if the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance upon opinion or discretion.'" *Id*. at 378, 687 P.2d at 386, *quoting Ariz. Title Ins. & Trust Co. v. O'Malley Lumber Co*., 14 Ariz. App. 486, 496, 484 P.2d 639, 649 (1971); *cf. Alta Vista Plaza, Ltd. v. Insulation Specialists Co.*, 186 Ariz. 81, 82-83, 919 P.2d 176, 177-78 (App. 1995) (damages liquidated when value easily ascertainable). Application of this statute, therefore, would appear to demand a result at odds with our supreme court's decision in *Calmat*, which states that interest on a judgment for inverse condemnation "runs from the date of taking." 176 Ariz. at 196, 859 P.2d at 1329.

¶21    Given that neither statute plainly applies and Dos Picos is constitutionally entitled to interest, this court is faced with either applying a related statute that does not on its face control or relying on a more general statute and interpreting one of its terms in a manner contrary to established precedent. *See id.* at 192, 859 P.2d at 1325 (landowner

14

entitled to compensation in inverse condemnation even when no specific statutory procedure governs). Based on guidance provided in *Calmat*, we elect the former. In *Calmat*, our supreme court articulated that, when doing so will further legislative intent, we may apply a direct condemnation statute to an inverse condemnation action. *Id*. at 193.

¶22 It is well established that direct and inverse condemnation are considered similar procedures and many portions of the direct condemnation statutes can apply to inverse condemnation actions as well. *See id*.; *see also Salaz*, 157 Ariz. at 253, 756 P.2d at 350; *State v. Hollis*, 93 Ariz. 200, 203, 379 P.2d 750, 751 (1963). And at oral argument, Dos Picos agreed that the purpose of requiring the payment of interest in direct and inverse condemnation actions is the same. Although we acknowledge that statutes governing direct condemnation do not apply universally to inverse condemnation, we can see no reason why § 11-269.04 otherwise would not apply. The legislature exempted direct condemnation actions from § 44-1201(A) and mandated that the prime rate should apply even after judgment. By doing so, the legislature exhibited an intent to treat differently from other civil judgments those involving eminent domain. *See* A.R.S. § 44-1201(B). Because inverse condemnation "'is still in the nature of a condemnation of a private property right by the State under the sovereign right of eminent domain,'" we reasonably can infer the legislature intended to remove it from § 44-1201 as well. *Calmat*, 176 Ariz. at 193, 859 P.2d at 1326, *quoting Hollis*, 93 Ariz. at 203, 379 P.2d at 751.

¶23 Additionally, "[a]lthough the right to interest is intertwined with the right to just compensation, the right to interest is procedural because it relates only to enforcement of the substantive right—just compensation." *State ex rel. Miller v. Beardsley Indus. Prop.*, 173 Ariz. 19, 24, 839 P.2d 439, 444 (App. 1992). And direct condemnation statutes governing procedural matters are more freely applied to inverse condemnation actions than those governing substantive rights. *See Hollis*, 93 Ariz. at 203, 379 P.2d at 751 (applying direct condemnation statute in procedural area of venue); *see also Calmat*, 176 Ariz. at 193, 859 P.2d at 1326 (distinguishing between direct application of procedural versus substantive statutes).

¶24 Although we normally will adhere strictly to statutory language, our supreme court has clearly indicated that in some instances, direct and inverse condemnations are essentially two sides of the same coin. *See Calmat*, 176 Ariz. at 193-94, 859 P.2d at 1326-27. It is therefore the duty of an interpreting court to look beyond the express language of a direct condemnation statute and "consider [it]s effects and consequences, as well as its spirit and purpose" to determine whether it should govern an inverse condemnation action as well. *Id*. at 193. The parties have not identified, nor can we see, any reason for excluding inverse condemnation from § 11-269.04; its exclusion would appear to accomplish no purpose. *Cf. id*. at 193-94 (timing difference inherent between direct and inverse condemnation rendered direct compensation valuation statute inadequate compensation in inverse condemnation). Accordingly, we conclude Dos

16

Picos is entitled to interest at a rate consistent with § 11-269.04 beginning April 3, 2008, the date on which the trial court found the taking had occurred.

Attorney Fees

**¶25** Dos Picos has requested its attorney fees on appeal. There being no basis for an award of such fees, we deny its request.

## Disposition

**¶26** The trial court's order granting Dos Picos its litigation expenses is vacated, as is its award of interest on the judgment, and the case is remanded for a redetermination of interest consistent with this decision.

/s/ *Philip G. Espinosa*
PHILIP G. ESPINOSA, Judge

CONCURRING:

/s/ *Joseph W. Howard*
JOSEPH W. HOWARD, Chief Judge

/s/ *Virginia C. Kelly*
VIRGINIA C. KELLY, Judge