165 P.3d 211

STATE of Arizona, Plaintiff/Counterdefendant/Appellant/Cross-Appellee,

v.

MABERY RANCH, CO., L.L.C., an Arizona limited liability company, Defendant/Counterclaimant/Appellee/Cross–Appellant.

No. 1 CA–CV 06–0143.

Court of Appeals of Arizona,
Division 1, Department A.

Aug. 16, 2007.

235

Terry Goddard, Attorney General By Daniel P. Schaack and James R. Morrow, Assistant Attorneys General, Liability Management Section and Joy L. Hernbrode, Assistant Attorney General, Natural Resources Section, Phoenix, Attorneys for Plaintiff/Counterdefendant/Appellant/Cross–Appellee.

L. Richard Mabery, P.C. By L. Richard Mabery, Prescott, Attorney for Defendant/Counterclaimant/Appellee/Cross–Appellant.

## OPINION

JOHNSEN, Judge.

¶ 1 Mabery Ranch Company, L.L.C. ("Mabery") owns land in Yavapai County ("Mabery property"). Following a jury trial, the State of Arizona ex rel. Arizona State Parks Board ("State Parks") and Mabery appeal and cross-appeal, respectively, the trial court's final Amended Judgment on State Parks' declaratory judgment action and Mabery's counterclaim. We hold that (1) the State's filing of a declaratory judgment action to enforce alleged contract rights may not by itself give rise to a claim for inverse condemnation; (2) a damages claim brought under Arizona Revised Statutes ("A.R.S.") section 33–420 (2007) for improper recording of an interest in real property accrues when the claimant becomes aware of damages resulting from the improper recording; and (3) A.R.S. § 12–821.01 (2003), which requires a pre-complaint filing of a claim against a public entity, does not apply to a claim for injunctive relief seeking to restrain governmental conduct.

## FACTS AND PROCEDURAL HISTORY

¶ 2 The story of what became a bitter dispute between Mabery and State Parks

began in 1968, when Charles Mabery ("Mr. Mabery") purchased approximately 28 acres ("original holding") north of Cottonwood. The Verde River lay to the west of the original holding; directly to the east lay property owned by Louise and Walter Edwards. In 1984, Mr. Mabery obtained an easement running roughly west-to-east across the Edwards' property ("Edwards Easement"), the details of which are discussed at length below. Mr. and Mrs. Edwards then sold their property to State Parks; whatever rights the Edwards Easement granted remained in favor of Mr. Mabery and his successors in interest. A few years later, in 1991, Mr. Mabery sold some of the eastern portion of the original holding to State Parks. In the sale transaction, Mr. Mabery reserved for himself and his successors in interest an easement for ingress and egress ("Mabery Easement"). Linked together, the alignments of the Mabery Easement and the Edwards Easement provided a route from the remaining Mabery property eastward to Tuzigoot Road, which runs roughly north/south at that location.

¶ 3 Mr. Mabery's family company, as his successor in interest, came to own approximately eight acres remaining from the original holding. Due to State Parks' various purchases of nearby land, by 1993, the Mabery property was surrounded by the Verde River and by property owned by the State. Directly to the east of the Mabery property was Dead Horse Ranch State Park ("Dead Horse Park"), owned by State Parks. The Mabery and Edwards Easements extended to a section of Tuzigoot Road located within Dead Horse Park.

¶ 4 Mabery decided in 1993 to establish a chuckwagon and entertainment "venue" called the "Blazin' M Ranch" on what remained of the original holding. Mabery notified State Parks of its development plans and sought a conditional use permit from Yavapai County. During public hearings, State Parks objected to Mabery's proposed development as being incompatible with Dead Horse Park due to the development's potential for increased noise, dust and traffic. State Parks also disputed Mabery's right to use the Edwards and Mabery Easements for

public access to the Blazin' M Ranch. While State Parks did not dispute that Mabery was the successor in interest to the original holders of those easements, it contended that the terms of those easements restricted Mabery's use of those rights of way to private use, not commercial use.

¶ 5 Over State Parks' objection, Yavapai County approved a five-year, non-transferable conditional use permit for the operation of Blazin' M Ranch. At the same time, Mabery and State Parks entered into two agreements, an Easement Exchange Agreement ("Easement Agreement") and a License Agreement.

¶ 6 The premise of the Easement Agreement was stated in its first paragraph: "There presently exist certain easements across the [State Parks'] property in favor of [Mabery], and the parties have agreed to change the physical location of the existing easements." The Easement Agreement consolidated all recorded and unrecorded, prescribed and implied easements in favor of Mabery over State Parks' property into a single replacement easement at a new location described in Exhibit B to the Easement Agreement. Significantly, the Easement Agreement provided that although the parties agreed on a new location to replace all prior easements, neither party gave up its right to enforce its interpretation of the terms of the easements that had been consolidated into the new location.

¶ 7 Although the License Agreement acknowledged the parties' agreement-to-disagree over the terms of the various easements, it granted Mabery the right, over the life of the License Agreement, to use the relocated easement for ingress and egress for guests of the Blazin' M Ranch. Although the replacement alignment provided a route in and out of the Blazin' M Ranch, Mabery agreed to State Parks' proposal to gate and lock that portion of Tuzigoot Road located within State Parks' land. The State gave Mabery a key to the lock, however, so that Mabery family members and others could access the road (and Dead Horse Park) on horseback.

¶ 8 About a year and a half before the expiration of the License Agreement, Ma-

bery contacted State Parks about renegotiating the agreement. Asserting that State Parks' prior concerns about noise, dust and traffic had never materialized, Mabery sought a permanent transferable license. In the summer of 1999, over State Parks' objections, Mabery obtained a permanent transferable use permit from Yavapai County with fewer restrictions than the original conditional use permit. However, Mabery and State Parks were unable to renegotiate a new License Agreement before the original one expired in October 1999. Thereafter, Mabery continued to operate Blazin' M Ranch without a license agreement and without any resolution of its disputes with State Parks over the nature and scope of the replacement easement.

¶ 9 In February 2000, with negotiations still stalled, State Parks filed a Notice of Reservation of Rights ("Rights Reservation") in the Yavapai County Recorder's Office. The Rights Reservation described the Easement Agreement and declared that State Parks intended to retain its right to assert its interpretation of the agreement and the restrictions State Parks believed it imposed on the replacement easement. Objecting to the State's filing, Mabery wrote to State Parks on March 3, 2000 and warned that Mabery intended to protect its rights under A.R.S. § 33–420, which prohibits the improper recording of documents claiming an interest in real property.

¶ 10 After more than another year went by without a new license agreement, on March 26, 2001, State Parks filed a declaratory judgment action seeking a judicial determination that (1) the replacement easement established in the Easement Agreement was restricted to "personal" rights of ingress and egress and for the placement of utilities and (2) Mabery could not use the replacement easement for commercial activity without the State's consent. State Parks also sought an injunction enforcing the Easement Agreement as State Parks understood it.

¶ 11 Mabery wrote to State Parks again on April 5, 2001, demanding it release its recording of the Rights Reservation. On May 30, 2001, Mabery answered State Parks' complaint and filed a counterclaim asserting four causes of action alleging inverse eminent domain (Count One) and interference with Tuzigoot Road (Count Two), seeking reformation or rescission of the 1991 deed to the State (Count Three) and alleging that the recording of the Rights Reservation was improper and in violation of A.R.S. § 33–420 (Count Four).

¶ 12 State Parks moved for summary judgment on each of the claims in Mabery's counterclaim and at the same time moved to dismiss Counts One, Three and Four of the counterclaim for failure to state a claim. The State argued that the one-year limitations period established in A.R.S. § 12–821 (2003) had run on each count, and further argued that Mabery had failed to file a notice of claim pursuant to A.R.S. § 12–821.01(A) on any count. Alternatively, State Parks argued that Count One failed to state a proper claim for inverse condemnation. It additionally argued that as to Count Three of the counterclaim, Mabery failed to allege a mutual mistake of fact that might entitle it to reformation and on Count Four, it argued Mabery could not show that the Rights Reservation was groundless or contained a material misstatement.

¶ 13 Mabery responded and filed a cross-motion for partial summary judgment on three issues:

1. That the right of access of [Mabery] is superior and dominant to the subservient fee ownership of State Parks;

2. That the commercial use of the existing roadway by [Mabery] is within the private property rights appurtenant to the [Mabery] parcel; and

3. That State Parks may not hinder or interfere with [Mabery's] right to use Tuzigoot Road.

¶ 14 The superior court ruled December 6, 2002, on the cross-motions for summary judgment and the motion to dismiss. It granted in part Mabery's motion for summary judgment on State Parks' declaratory judgment action, finding that the Easement Agreement was ambiguous in that it incorporated both unrestricted and restricted easements but that the Arizona Constitution and A.R.S. § 41–1314 (2004) prevented the ambi-

guity from being resolved in favor of State Parks. Therefore, the court found the Easement Agreement gave Mabery an unrestricted easement for access over State Parks' land. However, the court stated, there remained for trial a factual issue whether Mabery's current use was "an increase and burden on State Parks land."

¶ 15 The court denied Mabery's cross-motion for summary judgment with respect to the Tuzigoot Road claim, concluding that two factual issues remained for trial: (1) "whether [Mabery] has a prescriptive or implied easement over Tuzigoot Road," and (2) "whether State Parks has hindered or interfered with the access."

¶ 16 With respect to State Parks' motion for summary judgment based on limitations, the court granted the motion as to Count Three of Mabery's counterclaim, rescission/reformation of the 1991 deed, but denied the motion with respect to Counts One, Two and Four of the counterclaim. The court concluded that Count Three was a contract action that accrued when the deed was recorded in 1991. In denying the motion as to Counts One and Two, the court concluded those counts were not time-barred because they arose only when State Parks filed the declaratory judgment action on March 26, 2001. As to Count Four, the court concluded the statute of limitations was not a bar because a separate cause of action accrued each day the Rights Reservation remained recorded, and at the time of the ruling, the Rights Reservation was still recorded.[1]

¶ 17 The trial court also denied State Parks' contention that each of the counterclaims was barred by Mabery's failure to comply with the notice-of-claim requirement in A.R.S. § 12–821.01(A). As to Counts One and Two, the court concluded that the counterclaim itself substantially complied with A.R.S. § 12–821.01(A) and that it would be unjust to bar the counterclaim for lack of notice because it followed years of transac-tions and negotiations. As to Count Four, the court concluded that Mabery's April 5, 2001 letter objecting to the recording of the Rights Reservation complied with the statute.

¶ 18 The court denied State Parks' motion to dismiss Mabery's counterclaim for inverse eminent domain, concluding the State's declaratory judgment action amounted to a taking, and found that the restrictions State Parks sued to impose on Mabery's access rights could give rise to an inverse eminent domain claim. The court denied State Parks' motion to dismiss Count Two of the counterclaim for interference with Tuzigoot Road, "find[ing] that the claim is sufficient under the notice pleading requirements of Arizona law." The court likewise rejected State Parks' motion to dismiss Count Four of the counterclaim for improper recording in violation of A.R.S. § 33–420. The court found no authority authorizing the recording of a document such as the Rights Reservation.

¶ 19 Other pretrial motions followed. Asserting that the court had ruled on summary judgment that Mabery had established a violation of the improper recording statute, A.R.S. § 33–420, Mabery filed a motion to determine the amount of statutory damages on that claim. Mabery argued that State Parks owed per-day statutory damages and asked the court to rule that State Parks' filing of its "Withdrawal of Notice of Reservation of Rights" on March 21, 2003 was insufficient to stop the accrual of damages. In a ruling issued February 2, 2004, the court found as a matter of law that State Parks violated A.R.S. § 33–420 because the Reservation of Rights was not authorized under statute, judgment or other legal authority and was therefore presumed groundless and invalid under section 33–420(D). The court also ruled that the "withdrawal of notice" document did not remove the Rights Reservation recording for purposes of Mabery's claim under the improper recording

---

1. On March 21, 2003, State Parks recorded a document called "Withdrawal of Notice of Reservation of Rights," which stated that State Parks withdrew and extinguished the Rights Reservation. The superior court later ruled that the March 2003 filing did not remove the Rights Reservation for purposes of Mabery's claim for violation of the improper recording statute, A.R.S. § 33–420. Because we find that Mabery's claim for damages under section 33–420 was barred by limitations, we need not resolve whether the withdrawal document relieved the State of any implications of its original filing.

statute. The court left for the jury the issue of damages arising from the improper recording.

¶ 20 A ten-day jury trial took place in June and July 2004. On the inverse condemnation counterclaim, the jury concluded that State Parks had taken Mabery's property in violation of its constitutional rights and found damages of $150,000. The jury also assessed actual damages of $620,000 for State Parks' violation of A.R.S. § 33–420. (The court subsequently trebled those damages, as provided for by section 33–420(A).) The jury further found that State Parks had interfered with Mabery's use of Tuzigoot Road. Although the jury rejected Mabery's claim for damages arising from that interference, at the invitation of the judge to delineate any prescriptive easement it found in favor of Mabery, the jury designated the location of an easement leading from the Mabery property to Tuzigoot Road.

¶ 21 The Amended Judgment was filed January 11, 2006. State Parks timely appealed and Mabery timely cross-appealed. We have jurisdiction pursuant to A.R.S. § 12–2101(B) (2003).

## DISCUSSION

¶ 22 State Parks argues the following on appeal: (1) Mabery did not state a claim for inverse condemnation because the State "neither physically invaded [Mabery's] land nor enacted any land-use regulations affecting [Mabery's] land, and the land maintains economic viability;" (2) each of Mabery's counterclaims was barred by Mabery's failure to comply with A.R.S. § 12–821.01; (3) Mabery's counterclaims likewise were barred by limitations; (4) the superior court erroneously granted judgment against the State on the improper-recording claim pursuant to A.R.S. § 33–420; (5) even assuming Mabery's improper-recording claim was valid, the damages awarded by the jury and trebled by the court were excessive; (6) the court erred by granting Mabery an easement leading to and through Tuzigoot Road; and (7) on the State's claim for declaratory judgment, the court erred by finding in favor of Mabery's interpretation of the Easement Agreement. For its part, Mabery argues in its cross-appeal that the trial court erred by dismissing Count Three of its counterclaim for rescission/reformation of the 1991 deed. We address the various claims and counterclaims in order.

## A. State Parks' Claim for Declaratory Judgment re Easement Agreement.

¶ 23 We review *de novo* the grant of summary judgment. *Aranki v. RKP Invs., Inc.,* 194 Ariz. 206, 208, ¶ 6, 979 P.2d 534, 536 (App.1999); *Great Am. Mortgage, Inc. v. Statewide Ins. Co.,* 189 Ariz. 123, 125, 938 P.2d 1124, 1126 (App.1997). We review the evidence in the light most favorable to the party opposing the motion "and draw all reasonable inferences in favor of that party." *AROK Constr. Co. v. Indian Constr. Servs.,* 174 Ariz. 291, 293, 848 P.2d 870, 872 (App. 1993). Summary judgment is appropriate when "the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme Sch. v. Reeves,* 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). Where a contract's language is reasonably susceptible to more than one meaning, the interpretation of the contract should be submitted to the jury. *Taylor v. State Farm Mut. Auto. Ins. Co.,* 175 Ariz. 148, 158–59, 854 P.2d 1134, 1144–45 (1993); *see also Long v. City of Glendale,* 208 Ariz. 319, 328–29, ¶¶ 26–34, 93 P.3d 519, 528–29 (App.2004) (applying *Taylor* to interpretation of a deed).

¶ 24 State Parks' complaint sought a declaratory judgment that Mabery's rights under the Easement Agreement were limited to company members' "personal rights of ingress and egress to the Mabery Property and for the placement of utilities" and that absent further agreement, Mabery could not use the replacement easement "for commercial activity." Mabery's motion for summary judgment argued that, contrary to State Parks' contention, the Easement Agreement granted Mabery an unrestricted easement along the replacement route. For the reasons that follow, we hold the Easement Agreement to be reasonably susceptible to differing interpretations and conclude that

material questions of fact precluded entry of summary judgment in favor of Mabery.

### 1. The Easement Agreement.

¶ 25 As noted above, Mabery and State Parks entered into the Easement Agreement in early June 1994. The agreement provided:

1. [Mabery] releases, abandons and terminates as to their respective locations the easements for ingress, egress and utilities, as set forth in the documents referenced in *Exhibit "A"* to this Easement Exchange Agreement and any unrecorded, implied or prescriptive easements across [State Parks'] property in favor of [Mabery] except for any prescriptive or implied claims to the Tuzigoot Road. In consideration thereof, [State Parks] does hereby grant to [Mabery] a non-exclusive replacement easement at the location which is more fully described in *Exhibit "B"* to this Agreement. The parties agree that any recorded, implied or prescriptive claims or rights of access from [Mabery's] property to the Tuzigoot Road shall be located in the area described in Exhibit "B." The limitations of the easements described in Exhibit A and as repeated below in subparagraphs 1.a, .b, .c, and .d shall be ascribed to the easement in Exhibit B. This easement is subject to the following reservations, rights, terms and conditions which are referenced in certain of the abandoned easements:

a. The right to enter upon the described land and grade, level, fill, drain, pave, build, maintain, repair and rebuild a roadway for ingress and egress and the installation of utilities on, over, and across the easement;

b. The easement is granted for private use of [Mabery] who shall allow no "through" commercial haulage over this easement;

c. The easement is granted for the purpose of passing over the roadway with a vehicle or any other reasonable manner, but [Mabery] may not expand the easement in use or area nor construct any structures;

. . . .

2. Neither party grants, conveys, transfers, waives, releases or shall hereafter be estopped in any manner regarding the enforcement of their respective interpretations of the existing language in the easements, nor the effect or validity as to any permitted uses or any limitations of uses of the dominant or servient estates under the existing language of the easements or as provided by law. This agreement for exchange of location of the easements shall not be considered an expansion or limitation of either party's lawful rights, obligations or appurtenances existing as of the date hereof. The sole intent and purpose of this Agreement is to provide for a change of location of (1) the existing recorded easements from the areas described in Exhibit "A," and (2) the location of unrecorded easements, if any, from their respective locations, to the location described in Exhibit "B," except for [Mabery's] prescriptive or implied claim of access over the Tuzigoot Road.

¶ 26 Among the recorded easements listed on Exhibit A to the Easement Agreement was the Edwards Easement. That easement, dated April 27, 1984, granted to Mabery's predecessor in interest "the right to enter upon ... and grade, level, fill, drain, pave, build, maintain, repair and rebuild a road or roadway, for ingress and egress and the installation of utilities on, over and across the ground...." Of particular interest was an express condition of the easement that provided: "Within 60 days after granting the easement, grantees shall construct a road within the easement which is being granted for the private use of the property owners who shall allow no 'through' commercial haulage over this easement." [2]

---

**2.** Another easement document listed on Exhibit A to the Easement Agreement was the Mabery Easement, contained in the 1991 Warranty Deed by which Mabery's predecessor conveyed property to State Parks. That Warranty Deed, which was the subject of Count Three of Mabery's counterclaim for rescission/reformation, provided that the easement was granted "for the purpose of passing over the easement with a vehicle or any other reasonable manner" and that Mabery could maintain, repair or rebuild a road on the easement "for the purpose described above, but

¶ 27 The parties agree that as a general proposition, the Easement Agreement consolidated all recorded and unrecorded, prescribed and implied easements in favor of Mabery over State Parks' property into a single easement at a new location described in Exhibit B to the Easement Agreement. As the superior court recognized, however, the various provisions of the Easement Agreement governing the terms of the replacement easement were, to put it mildly, internally inconsistent. Some of the consolidated easement grants contained language that arguably restricted, perhaps severely, Mabery's right to use the easements. The Edwards Easement described above, for example, arguably limited the easement to Mabery's "private use." On the other hand, Mabery argued that other historical recorded easements listed on Exhibit A to the agreement contained entirely unrestricted grants of access.[3]

## 2. Legal analysis.

■ ¶ 28 "Generally, and in Arizona, a court will attempt to enforce a contract according to the parties' intent." *Taylor*, 175 Ariz. at 152, 854 P.2d at 1138. When a trial court interprets a written agreement according to the intent of the parties, before admitting external evidence, the court first must consider the alleged interpretation of the agreement offered by the proponent of the extrinsic evidence in light of the extrinsic evidence offered. *Long*, 208 Ariz. at 328, ¶ 28, 93 P.3d at 528. Upon examination of the writing, "[i]f the court finds that the writing is 'reasonably susceptible' to the interpretation suggested by the proponent of the extrinsic evidence then the court should admit the extrinsic evidence." *Id.* (quoting *Taylor*, 175 Ariz. at 155, 854 P.2d at 1140). "Whether contract language is reasonably susceptible to more than one interpretation so that extrinsic evidence is admissible is a question of law for the court." *Taylor*, 175 Ariz. at 158–59, 854 P.2d at 1144–45. Where contract language is susceptible to more than one interpretation, the matter should be submitted to the jury. *Id.* at 159, 854 P.2d at 1145.

■ ¶ 29 As noted above, the Easement Agreement expressly stated that the replacement easement was to be "subject to" certain restrictions, including the "private use" restriction that had been contained in the Edwards Easement. By this language, the agreement seemed to say that any of the recited restrictions that once limited Mabery's rights under any of the consolidated easements were to be imposed on the replacement easement. At the same time, however, as recited above, the agreement expressly provided that it "shall not be considered an expansion or limitation of either party's lawful rights, obligations or appurtenances" existing as of the date of the agreement.

¶ 30 Moreover, although State Parks argued the Edwards Easement as incorporated into the Easement Agreement severely limited Mabery's rights, significant questions of material fact about the scope of that easement were presented in the parties' summary judgment papers. Mr. and Mrs. Edwards each signed affidavits swearing that by limiting their grant of easement to "private use" by Mabery, they meant to exclude all commercial uses. On the other hand, Mr. Mabery averred that he understood the limiting language in the Edwards Easement barred only commercial haulage vehicles.

¶ 31 In adopting Mabery's interpretation of the Easement Agreement, the superior court recognized the limiting language of the Edwards and Mabery Easements, but held that the Easement Agreement's recitation of those restrictions was trumped by the provi-

---

may not expand the easement in use or area nor construct any structures." Because we reverse the court's grant of summary judgment due to questions of fact concerning the interpretation of the Easement Agreement, we do not address the effect, if any, on the replacement easement of the restrictions stated in the Warranty Deed easement grant.

3. State Parks argues on appeal that Mabery failed to prove the location and scope of those purportedly unrestricted easements by way of admissible evidence as required by Arizona Rule of Civil Procedure 56. We do not address that issue; instead, we assume without deciding that some of the easement grants that were consolidated into the replacement easement contained unrestricted grants of access.

sion that the agreement "shall not be considered an expansion or *limitation* of either party's lawful rights." (Emphasis added.) In resolving the ambiguity in Mabery's favor, the court was guided by its belief that construing the Easement Agreement in favor of State Parks would amount to a taking by the State of Mabery's property rights.[4] The court's analysis misapprehends the relevant law. As explained more fully, *infra* ¶¶ 33–40, the State cannot "take" an individual's private property if that property does not belong to the individual in the first place.

¶ 32 Because the Easement Agreement language was susceptible to differing interpretations, we hold that the court applied an erroneous presumption in construing obvious ambiguities in favor of Mabery, and vacate the grant of summary judgment in Mabery's favor on the State's claim for declaratory relief.[5]

## B. Inverse Condemnation (Count One of Mabery's Counterclaim).

¶ 33 The trial court denied State Parks' motion to dismiss Mabery's counterclaim for inverse condemnation, rejecting the State's argument that as a matter of law there had been no taking. To the contrary, the court stated that State Parks' filing of the declaratory judgment action constituted a taking and further found that the restrictions State Parks sought to enforce on Mabery's use of its property through the lawsuit could give rise to an inverse condemnation claim.[6]

¶ 34 We review *de novo* issues determined as a matter of law. *See Acuna v. Kroack,* 212 Ariz. 104, 110, ¶ 23, 128 P.3d 221, 227 (App.2006) (reviewing *de novo* denial of motion for judgment as a matter of law).

¶ 35 Under the Arizona Constitution, property shall not be "taken or damaged" without just compensation. *DUWA, Inc. v. City of Tempe,* 203 Ariz. 181, 183,

¶ 12, 52 P.3d 213, 215 (App.2002) (quoting Arizona Constitution, Article 2, Section 17). Mabery asserted that State Parks' declaratory judgment action constituted inverse condemnation, not direct condemnation. "If there has been a taking and the pertinent governmental authority has failed to pursue a proper condemnation action, the landowner may initiate an inverse condemnation action to secure compensation." *Id.* In inverse condemnation cases, Arizona law "has only recognized a 'taking' of property where the government either assumes actual possession of the property or places a legal restraint upon the property that substantially diminishes or destroys the owner's right to, and use and enjoyment of, the property." *Id.* at 184, ¶ 16, 52 P.3d at 216.

¶ 36 On appeal, State Parks argues that Mabery did not state a claim for inverse condemnation because the State "neither physically invaded [Mabery's] land nor enacted any land-use regulation affecting [Mabery's] land, and the land maintains economic viability." Mabery argues that the State's interpretation of the Mabery and Edwards Easements, which underlay the State's claim for declaratory judgment, was invalid and disregarded Mabery's rights under recorded easements with unrestrictive language, prescriptive and implied easement rights. It argues that State Parks' declaratory judgment action and associated claim for injunctive relief constituted an attempt by the State to "permanently impair use of the access by insisting that it had the sole right to determine" the scope of Mabery's use of the replacement easement.

¶ 37 As described above, State Parks and Mabery were in a long-standing dispute over their respective rights under the Easement Agreement and the original easements whose terms were incorporated therein. The

---

4. The superior court entered summary judgment in favor of Mabery despite its counsel's concession during oral argument that if the court found the Easement Agreement to be ambiguous, summary judgment would be improper.

5. On the first day of trial, State Parks voluntarily dismissed with prejudice its other claim, which sought injunctive relief.

6. As noted, the jury found that the declaratory judgment action constituted a taking without just compensation and assessed damages of $150,000 against State Parks.

purpose of a declaratory judgment action is to obtain a judicial determination of parties' rights and obligations in a controversy prior to one party's breach of those rights. *Elkins v. Vana,* 25 Ariz.App. 122, 126, 541 P.2d 585, 589 (1975). Accordingly, the State's declaratory judgment action sought a determination by the court of the parties' respective rights under the Easement Agreement.

¶ 38 Mabery has not cited, nor have we found, any case law supporting its assertion that filing a declaratory judgment action may constitute a taking. Rather, by definition, a declaratory judgment such as the State sought would not deprive a party of any rights because it would merely "declare" the rights the party enjoyed prior to the inception of the lawsuit. And since such a declaratory judgment itself cannot constitute a taking, a governmental entity does not commit a taking by filing a complaint seeking such a judgment. Although Mabery acknowledges that State Parks' declaratory judgment complaint did not seek an order condemning Mabery's property, it disregards the fact that in filing its complaint, the State was not exercising any regulatory power but instead was acting as any other party seeking an interpretation of rights based in contract. In that respect, the State's lawsuit was no different than a declaratory judgment action of the sort routinely brought by private parties (and government agencies) when a dispute arises about the meaning of a contract.

¶ 39 Mabery argues the State's declaratory judgment action and associated request for injunctive relief would have "put the Blazin' M operation out of business" and deprived Mabery of its rights under the Yavapai County conditional use permit and zoning ordinances. But as stated above, State Parks could not "take" property in which Mabery had no property right to begin with. As this court stated in *Mutschler v. City of*

*Phoenix,* 212 Ariz. 160, 129 P.3d 71 (App. 2006):

> [T]he particular interest in land with respect to which a takings claimant asserts a diminution in (or elimination of) value must be a protected property interest, that is, one that inhered in the title acquired by the claimant . . ., before any determination is made whether the governmental action amounted to a compensable taking of that property interest.

*Id.* at 165, ¶ 16, 129 P.3d at 76.[7]

¶ 40 Because we conclude that the filing of the declaratory judgment complaint as a matter of law could not constitute a taking, we reverse the judgment and damages in favor of Mabery on Count One of its counterclaim and direct that judgment be entered in favor of State Parks on that claim.

## C. Tuzigoot Road (Count Two of Mabery's Counterclaim).

¶ 41 As noted, in the License Agreement, Mabery agreed to State Parks' desire to close Tuzigoot Road. Having received Mabery's consent, State Parks installed fences and gates across the road and provided Mabery with a key for use by members of the Mabery family and their associates. Upon expiration of the License Agreement, and with an eye toward using the road for Blazin' M Ranch wagon rides and the like, Mabery notified State Parks that it no longer consented to the road closure. It installed its own locks on the gate so that it would have access to the road, but State Parks subsequently removed the locks.

¶ 42 In Count Two of its counterclaim, Mabery alleged that by denying Mabery use of Tuzigoot Road, State Parks damaged Mabery's property or committed a taking without just compensation, in violation of Article 2, Section 17, of the Arizona Constitution. Mabery sought damages for what it alleged was State Parks' "hindrance, delay and ob-

---

7. The State points out the irony in Mabery's contention that the mere filing of the declaratory action complaint constituted a taking, without regard to the ultimate outcome of the lawsuit. That is, by Mabery's account, Mabery may recover for inverse condemnation even if the court ultimately were to rule against State Parks on the State's declaratory judgment claim, thereby upholding Mabery's view of its easement rights. In such event, Mabery not only would prevail in the easement dispute but also would win a money judgment on its taking claim. By the same token, according to Mabery, the State would be liable for inverse condemnation even if the State ultimately were to prevail in its declaratory judgment action.

struction" of Tuzigoot Road, and also prayed for an injunction barring State Parks from "further hindering or obstructing" Mabery's "right of access to and across Tuzigoot Road."

¶ 43 The superior court denied both sides' motions for summary judgment on the Tuzigoot Road claim. It first found the claim was not barred by limitations or by the claims statute, A.R.S. § 12–821.01.[8] In denying Mabery's motion, the court found that the Easement Agreement had not resolved Mabery's claimed "prescriptive or implied easement over Tuzigoot Road." Accordingly, it found a question of fact as to whether Mabery had a right to use the road; if it did have a right to use the road, a question of fact also remained about whether State Parks "hindered or interfered with" Mabery's right.

¶ 44 At trial, the jury found that Mabery had a right to use Tuzigoot Road by way of a prescriptive easement, and based on its verdict, the superior court entered an injunction restraining State Parks from interfering with Mabery's use of the road. Although it concluded that Mabery had proved a right to use Tuzigoot Road, the jury found that State Parks had not impaired Mabery's right of access, and so awarded Mabery no damages on this claim.[9]

### 1. Application of A.R.S. § 12–821.01 to Mabery's Tuzigoot Road claim.

■■ ¶ 45 As with the other claims discussed above, State Parks argues that Mabery's claim with respect to Tuzigoot Road was barred by its failure to file a timely (or any) notice of claim pursuant to A.R.S. § 12–

821.01. The superior court denied State Parks' motion to dismiss or for summary judgment on this claim, finding that given the "years of transactions and negotiations between the parties," Mabery had substantially complied with the claim statute.

¶ 46 On appeal, State Parks renews its contention that Mabery's Tuzigoot Road counterclaim should have been dismissed based on its failure to file a notice of claim pursuant to A.R.S. § 12–821.01. Mabery's claim for damages for interference with the road is no longer relevant, given the jury verdict in favor of State Parks on that claim. As noted, however, the court entered judgment of a prescriptive easement in favor of Mabery to use the road and enjoined State Parks from interfering with that use. We agree with Mabery that section 12–821.01 does not apply to its claim for injunctive relief as to Tuzigoot Road and hold that the court correctly denied State Parks' motion to dismiss for failure to file a notice of claim with respect to that claim.[10]

¶ 47 Although no Arizona court has resolved whether A.R.S. § 12–821.01 applies to a claim for injunctive relief, in *Martineau v. Maricopa County*, 207 Ariz. 332, 86 P.3d 912 (App.2004), this court held that the statute has no application to a claim for declaratory judgment. *Id.* at 337, ¶ 25, 86 P.3d at 917.[11] At issue in *Martineau* was a claim seeking a declaratory judgment invalidating a county training policy. *Id.* at 333, ¶ 2, 86 P.3d at 913. Claimants in that case sought no damages, and the declaratory relief for which they prayed "would not result in any monetary award against the County even if suc-

8. According to the counterclaim, which was served May 30, 2001, State Parks' removal of the locks occurred within the 60 days prior to filing of the counterclaim. On appeal, State Parks concedes that the Tuzigoot Road counterclaim was not untimely.

9. The jury also delineated the alignment of a prescriptive easement leading from the Mabery property to Tuzigoot Road. *See infra* ¶ 54.

10. We may affirm the superior court's ruling for any reason supported by the record. *Gary Outdoor Adver. Co. v. Sun Lodge, Inc.*, 133 Ariz. 240, 242, 650 P.2d 1222, 1224 (1982). In ¶¶ 54–59, *infra*, we vacate the portions of the judgment

establishing easements in favor of Mabery leading from its property to Tuzigoot Road and over Tuzigoot Road itself and enjoining the State from interfering with those easements. We address whether A.R.S. § 12–821.01 applies to a claim for injunctive relief against the state because the issue is likely to arise again on remand.

11. Mabery argues on appeal that *Martineau* "determined that declaratory judgments and injunctions do not require a notice of claim." Although we find no language in *Martineau* to that effect, the reasoning of that case guides our conclusion that A.R.S. § 12–821.01 does not apply to Mabery's claim for injunctive relief.

cessful." *Id.* at 336, ¶ 20, 86 P.3d at 916. As a result, the court noted in holding that section 12–821.01 did not apply, the outcome "would have no direct effect upon the County's financial planning or budgeting." *Id.*

¶ 48 The same reasoning applies to a claim such as Mabery's claim for injunctive relief. Mabery sought an order restraining State Parks from further alleged acts of interference with Mabery's right to use Tuzigoot Road. Like the declaratory judgment sought in *Martineau,* the order Mabery sought would not by itself have resulted in a monetary award against State Parks; nor are we told of any indirect budgetary effect such an order might have.

¶ 49 As *Martineau* explained, the language of the statute supports Mabery's assertion that it does not apply to a claim that seeks no damages from a governmental entity. *Id.* at ¶ 21, 86 P.3d 912. The statute requires that "[p]ersons who have claims against a public entity or a public employee shall file claims" within 180 days after the cause of action accrues. A.R.S. § 12–821.01(A). The claim must "contain facts sufficient to permit the public entity or public employee to understand the basis upon which liability is claimed." *Id.*

¶ 50 Significantly for this analysis, the statute in addition commands that the claim "shall also contain a specific amount for which the claim can be settled and the facts supporting that amount." *Id.; see Deer Valley Unified Sch. Dist. No. 97 v. Houser,* 214 Ariz. 293, 296, ¶ 9, 152 P.3d 490, 493 (2007) (the "specific amount" requirement of the statute is "clear and unequivocal"). As our supreme court stated in Deer Valley, the language of the statute "unmistakably instructs claimants to include a particular and certain amount of money that, if agreed to by the government entity, will settle the claim." 214 Ariz. at 296, ¶ 9, 152 P.3d at 493.

¶ 51 In interpreting a statute, "we apply 'fundamental principles of statutory construction, the cornerstone of which is the rule that the best and most reliable index of a statute's meaning is its language and, when the language is clear and unequivocal, it is determinative of the statute's construction.'"

*Id.* at ¶ 8, 152 P.3d 490 (quoting *Janson ex rel. Janson v. Christensen,* 167 Ariz. 470, 471, 808 P.2d 1222, 1223 (1991)).

¶ 52 Although section 12–821.01 does not define "claim," we know from its plain language that the drafters intended the statute to apply to claims for money damages. We may infer that by contrast, the drafters intended the statute not to apply to claims that seek only to restrain government conduct. Because such claims for injunctive relief by definition seek no money damages, it would be nonsensical for the statute to command such a claimant to state a "specific amount for which the claim can be settled." A.R.S. § 12–821.01(A). If the drafters had intended section 12–821.01 to apply to a claim such as this, which seeks merely to restrain government conduct, they would have included language excepting such a claim from the statute's mandate that the claimant inform the public entity or employee of the "specific amount for which the claim" could be settled. *Id.* That the statute provides a claimant who seeks an injunction no relief from the law's requirement to provide a "specific amount" it would take in settlement is a strong indication that the act is not intended to apply to such a claim. *Cf. Indep. Hous. Servs. of San Francisco v. Fillmore Ctr. Assocs.,* 840 F.Supp. 1328, 1357–58 (N.D.Cal.1993) (statute requiring pre-filing of claim preceding suit for "money or damages" does not bar a complaint seeking primarily injunctive and declaratory relief, even when incidental money damages are sought).

¶ 53 Accordingly, we conclude that section 12–821.01 does not apply to a claim such as this, in which a private party seeks an injunction restraining conduct by a public entity.

2. **The prescriptive easement leading to Tuzigoot Road.**

¶ 54 At trial, the jury was instructed that if it determined that Mabery had established a legal right to use Tuzigoot Road through a prescriptive easement, it should designate the route of that prescriptive easement on an aerial photograph. As noted, after concluding Mabery proved a prescriptive easement, the jury delineated an ease-

ment route extending from Mabery's property eastward over State Parks property to Tuzigoot Road, but did not delineate an easement over any portion of Tuzigoot Road itself.[12]

¶ 55 State Parks urges us to vacate the jury's finding of a prescriptive easement in favor of Mabery leading from the Mabery property to Tuzigoot Road. Based on the jury's alignment of that easement as leading *to* Tuzigoot Road but not along the road itself, the State argues that the jury must have misunderstood the court's instructions with respect to Mabery's right "to use" the road. By contrast, Mabery argues the jury acted correctly; a right "to use" Tuzigoot Road, it contends, necessarily includes the ability to get to the road.[13]

¶ 56 The State also argues that by drawing an alignment from the Mabery property to Tuzigoot Road, the jury effectively reinstated an easement that the parties had agreed in the Easement Agreement would be abandoned in favor of the replacement easement. The Easement Agreement provision on which State Parks relies states that "any recorded, implied or prescriptive claims or rights of access from [Mabery's] property to the Tuzigoot Road shall be located [in the replacement easement]." Mabery argues, however, that the route designated by the jury is consistent with another provision of the Easement Agreement by which Mabery released and abandoned "any unrecorded, implied or prescriptive easements across [State Parks'] property . . . except for any prescriptive or implied claims to the Tuzigoot Road."

 ¶ 57 As we have already observed, several provisions in the Easement Agreement are susceptible to more than one mean-

ing. This is true with respect to the agreement's provisions relating to an easement "to the Tuzigoot Road." On one hand, that phrase reasonably could mean an easement "to" the road itself, i.e., an easement that would lie only along Tuzigoot Road. On the other hand, the phrase reasonably could mean a route used to travel from the Mabery property *to* Tuzigoot Road. Where interpretation of a contract is needed because its terms are reasonably susceptible to different meanings, the matter should be submitted to the jury. *Taylor*, 175 Ariz. at 159, 854 P.2d at 1145.

¶ 58 The jury instructions on this claim, however, did not refer to the Easement Agreement; nor did they direct the jury to interpret the terms of that agreement in deciding the claim. Because the terms in the Easement Agreement pertaining to Tuzigoot Road access are reasonably susceptible to differing interpretations, the court erred by not instructing the jury to interpret the agreement in deciding the scope and location of any easement to which Mabery was entitled "to" Tuzigoot Road. *See id.* (upholding jury resolution of contract dispute when instruction clearly stated issue to be resolved).

¶ 59 For this reason, we vacate and remand the portions of the judgment establishing and delineating a prescriptive easement in favor of Mabery leading from its property to Tuzigoot Road and restraining State Parks from interfering with Mabery's rights to use that purported easement.

### 3. The prescriptive easement along Tuzigoot Road.

 ¶ 60 As noted, based on the jury's verdict that Mabery had established a right by prescriptive easement "to use" Tuzigoot

12. The route the jury drew from Mabery's property to Tuzigoot Road began at the southwest corner of the Mabery property, then followed the approximate alignment of the Mabery Easement and, from there, followed the approximate alignment of the Edwards Easement, concluding at the intersection of that alignment and Tuzigoot Road.

13. Mabery contends that rather than arguing that the jury should not have been permitted to designate an easement running from the Mabery property to Tuzigoot Road, State Parks instead

objected after trial only to the jury's designated route because it was "inconsistent with the Mabery and Edwards [Easements]." To the contrary, in its motion for a new trial, State Parks asked the court to reject the jury's designated alignment of the easement as contrary to the law and the evidence. It argued that the jury was asked to designate the alignment of any prescriptive easement along Tuzigoot Road but instead drew an eastward route running from the Mabery property to Tuzigoot Road.

Road, the superior court entered a judgment incorporating as the alignment of that easement a legal description of Tuzigoot Road's current alignment. We agree with State Parks that the court erred by entering judgment containing that easement alignment when the jury chose not to draw such an alignment.

¶ 61 The jury agreed on a verdict form that Mabery "had a legal right to use Tuzigoot Road through a prescriptive easement." Notwithstanding our decision to remand the question of whether the Easement Agreement permitted Mabery to claim a prescriptive easement from its property to Tuzigoot Road, we cannot disregard the fact that, having found that Mabery established a prescriptive easement "to use" Tuzigoot Road, and having been asked to delineate the route of that easement, the jury failed to delineate any easement along Tuzigoot Road itself. In view of the jury's failure to extend the prescriptive easement onto and along Tuzigoot Road, we hold that the court erred by delineating that easement itself.

¶ 62 Given the confusion evidenced by the inconsistency between the jury's conclusion that Mabery had established a prescriptive easement "to use" Tuzigoot Road and the jury's failure to delineate an easement route along that road, we vacate and remand the portion of the judgment establishing a prescriptive easement in favor of Mabery along Tuzigoot Road. We likewise vacate and remand the portion of the judgment restraining State Parks from interfering with Mabery's use of Tuzigoot Road.

**D. Rescission/Reformation of the 1991 Deed (Count Three of Mabery's Counterclaim).**

¶ 63 In its cross-appeal, Mabery argues State Parks was not entitled to summary judgment on Count Three of Mabery's counterclaim for rescission or reformation of the 1991 deed.[14]

¶ 64 Mabery alleged in its counterclaim that the 1991 deed by which Mr. Mabery conveyed land to State Parks, which reserved a restricted easement over the conveyed property, should be rescinded or reformed because State Parks unilaterally placed language in the deed restricting use of the reserved easement that was not in the purchase agreement or escrow instructions drafted in connection with the transaction. The superior court granted State Parks' motion for summary judgment on this claim, finding it was barred by the one-year limitations period of A.R.S. § 12–821 (2003). The court found that Mabery had knowledge of the terms of the deed when it was recorded in 1991; therefore, the contract action accrued long before the filing of Mabery's counterclaim.

¶ 65 Under A.R.S. § 12–821, "[a]ll actions against any public entity or public employee shall be brought within one year after the cause of action accrues and not afterward." A cause of action accrues "when the damaged party realizes he or she has been damaged and knows or reasonably should know the cause, source, act, event, instrumentality or condition which caused or contributed to the damages." A.R.S. § 12–821.01(B); *see Long v. City of Glendale,* 208 Ariz. 319, 325–26, ¶¶ 11–15, 93 P.3d 519, 525–26 (App.2004).

¶ 66 On appeal, Mabery concedes that, as stated in an affidavit submitted on summary judgment, Mr. Mabery knew of the modified language in the 1991 deed as early as 1993 or 1994. *See La Paz County v. Yuma County,* 153 Ariz. 162, 168, 735 P.2d 772, 778 (1987) ("[P]arties are bound by their judicial declarations."). Mabery also concedes that "[u]pon discovery of the change in language, the statute of limitations would have commenced," but asserts that the Easement Agreement[15] and the License Agreement[16]

---

14. Mabery's cross-appeal also argues that it was entitled to interest on the inverse condemnation award "from the date of the taking or damage." Because we conclude as a matter of law that there was no inverse condemnation, we do not address this issue.

15. The entire sentence in the Easement Agreement containing the language Mabery relies upon reads as follows:

Neither party grants, conveys, transfers, waives, releases or shall hereafter be estopped in any manner regarding the enforcement of their respective interpretations of the existing language in the easements, nor the effect or

estopped State Parks from asserting a limitations defense. Read in context, however, the provisions Mabery cites simply state that each party reserved its rights to assert its own interpretation of the easement terms. Neither provision purports to toll the time within which either party might assert a claim as to the easement grants.

¶ 67 Because Mabery concedes that Mr. Mabery knew of the modified language of the deed in 1994, the claim accrued and the statute of limitations ran, at the latest, years before Mabery filed its counterclaim and so is barred by A.R.S. § 12–821. *See 7200 Scottsdale Rd. Gen. Partners v. Kuhn Farm Mach. Inc.*, 184 Ariz. 341, 347, 909 P.2d 408, 414 (App.1995) ("Where the facts are not in dispute, we analyze the record to determine if the trial court correctly applied the law to the undisputed facts."). Therefore, we affirm the trial court's grant of summary judgment in favor of State Parks on Mabery's counterclaim for rescission/reformation of the 1991 deed.

### E. Improper–Recording Claim (Count Four of Mabery's Counterclaim).

■■■ ¶ 68 On appeal, the State raises several arguments against the superior court's grant of judgment in favor of Mabery on its counterclaim for damages under the improper recording statute, A.R.S. § 33–420. We reverse the judgment and vacate the award of damages in favor of Mabery on this claim because we conclude the claim was barred by limitations pursuant to A.R.S. § 12–821.

¶ 69 State Parks filed its Rights Reservation with the Yavapai County Recorder's Office on February 11, 2000. On March 3, 2000, after receiving a copy of the recorded notice, Mabery wrote a letter to the State Attorney General's Office citing A.R.S. § 33–

420 and asserting that if the filing of the Rights Reservation "interfere[d] with [its] financing, development or permits," Mabery would seek to recover for its "damages, attorney's fees and costs resulting from the filing." In April 2001, after State Parks filed its complaint, Mabery sent a second letter that asserted that the Rights Reservation violated A.R.S. § 33–420, renewed its demand that the notice be "release[d] of record," and "reserve[d] the right to seek attorney's fees, damages and costs" pursuant to section 33–420 if the Rights Reservation was not released.

¶ 70 Pursuant to A.R.S. § 12–821, a claim against the state is barred if not brought within one year "after the cause of action accrues." Mabery commenced its wrongful-recording claim on May 30, 2001, with the filing of its counterclaim. Thus, the claim was filed more than one year after the State recorded the Rights Reservation on which the claim was based. Mabery contends on appeal that its damage claim under A.R.S. § 33–420 did not accrue until it was aware it was damaged by the Rights Reservation. We do not need to decide whether Mabery's claim might have been saved by that rationale because it is plain that Mabery was aware of its alleged damages more than a year prior to its filing of the counterclaim.

¶ 71 In the first place, section 33–420(A) provides that one who proves a violation of the statute is entitled to damages of "not less than five thousand dollars, or for treble the actual damages caused by the recording...." Thus, having been aware at least since March 3, 2000, of the recording of the Rights Reservation, Mabery knew at least as of that date that if the recording violated the statute, it was entitled to "not less than five thousand dollars" in damages. We note also that Mabery cited that statutory provision in

validity as to any permitted uses or any limitations of uses of the dominant or servient estates under the existing language of the easements or as provided by law.

**16.** The entire sentence in the License Agreement containing the language Mabery relies upon reads as follows:

In the event that the Licensor revokes or terminates the revocable License and notwithstanding the fact that any unrecorded easements and the Edwards, Mabery and Other Recorded

Easements have been exchanged as to their location, neither party hereto waives, merges, grants, conveys, extinguishes, expands, limits, releases or shall hereafter be estopped from seeking enforcement of their respective interpretations of the existing language in the Mabery, Edwards or Other Recorded Easements under their currently existing terms and provisions or any arguments as to implied or prescriptive rights as provided by law.

its March 3, 2000 letter, in which it threatened to sue "for recovery of all of our damages" under the statute. Having threatened on March 3, 2000 to sue the State for the damages Mabery incurred as a result of the alleged wrongful recording, Mabery cannot now argue that it was unaware at the time that it had been damaged.

¶ 72 Mabery also argues that the superior court correctly held that limitations had not run on its claim pursuant to A.R.S. § 33–420 because under that statute, a new claim for damages accrued each day that the Rights Reservation remained in the Recorder's Office records. We disagree.

¶ 73 Mabery cites no language in the statute itself, and we find none, that supports its contention that a new claim for damages under section 33–420(A) accrues each day. Rather than rely on the express terms of the statute, Mabery's argument is based on *City of Tucson v. Morgan*, 13 Ariz.App. 193, 475 P.2d 285 (App.1970), which held that "a cause of action to quiet title for the removal of the cloud on title is a continuous one and never barred by limitations while the cloud exists." *Id.* at 195, 475 P.2d at 287. Mabery also relies on W.E. Shipley, Annotation, *Recording of Instrument Purporting to Affect Title as Slander of Title*, 39 A.L.R.2d 840 § 1(b) (1955) (hereinafter *"Recording A.L.R."*), for the proposition that "it has usually been held that the wrongful recordation gives rise to a continuing wrong[.]"

¶ 74 As the State points out, however, there is a significant distinction between a cause of action for damages, such as that brought by Mabery pursuant to A.R.S. § 33–420(A), and a cause of action to quiet title, which seeks a judicial determination of title, rather than damages, *see* A.R.S. § 33–420(B) & A.R.S. §§ 12–1101 to –1104 (2003) ("Action to Quiet Title"). *Morgan*, upon which Mabery relies, did not involve a claim for damages but instead was an action to clear title. 13 Ariz.App. at 193, 475 P.2d at 285. The A.L.R. annotation on which Mabery relies pointedly distinguished the two claims, observing that while slander of title may be a

continuous wrong, limitations on a damages claim for slander of title begins to run when damages result. *Recording A.L.R.* at § 1(b) ("[L]imitations will not begin to run against the cause of action *until damages actually result, and then only as to such damages.*" (emphasis added)).

¶ 75 For these reasons, we hold that Mabery's claim for damages under A.R.S. § 33–420 accrued when damages resulted from the alleged improper filing. In this case, because Mabery knew it had been damaged more than a year before it filed its claim pursuant to section 33–420, its claim is barred by A.R.S. § 12–821.[17]

## CONCLUSION

¶ 76 For the reasons discussed above, we vacate and remand the judgment in favor of Mabery on State Parks' declaratory judgment claim; reverse the judgment and vacate the award of damages in favor of Mabery on its counterclaim for inverse condemnation; vacate and remand the prescriptive easements in favor of Mabery leading from its property to Tuzigoot Road and over Tuzigoot Road; vacate and remand the grant of injunctive relief against State Parks with respect to those easements; affirm the judgment against Mabery on its counterclaim for rescission/reformation of the 1991 deed; and reverse the judgment and vacate the award of damages in favor of Mabery on its counterclaim for improper recording under A.R.S. § 33–420. We remand the case for further proceedings consistent with this opinion.

CONCURRING: PATRICIA A. OROZCO, Presiding Judge and G. MURRAY SNOW, Judge.

---

17. We are not called upon in this case to determine when a claim for injunctive relief to remove a recording that allegedly violates A.R.S. § 33– 420 might accrue for purposes of A.R.S. § 12– 821.